Kenneth W. STOOKEY and The Gas Machinery Company, Plaintiffs,

v.

Robert C. WATSON, Commissioner of Patents, Defendant.

Civ. A. No. 2554–54.

United States District Court
District of Columbia.

July 26, 1956.

———◆———

Ely, Pearne & Gordon (John F. Pearne) Cleveland, Ohio, Roberts B. Larson, Attorney at Law, Washington, D. C., for plaintiffs.

C. W. Moore, Solicitor, U. S. Patent Office, Washington, D. C. (Arthur H. Behrens, Washington, D. C., of counsel), for defendant.

WILKIN, District Judge (By Designation).

The plaintiffs bring this action under 35 U.S.C. § 145, to authorize the Commissioner of Patents to issue letters patent containing claims 24 to 29 of application Serial No. 151,222. Plaintiffs' application relates to a process for making combustible fuel gas from hydrocarbon oils (such as petroleum oils) in an "oil gas set" having one or more "gas generators" communicating with a so-called "superheater". Both the generator and superheater are large metal shells containing a heat storage material, such as a "checkerwork" of refractory brick, or the generator may in some instances have a so-called "refractory screen" made up of more closely packed, smaller refractory particles so as to trap and retain liberated carbon, or a combination of checkerwork and a refractory screen.

Plaintiffs' process, in common with the prior art, begins with a "heat run", which involves heating the generator and superheater to a suitable gas-making temperature by passing hot combustion products of "heat oil" and air "for-wardly" through the generator and then "forwardly" through the superheater. This is followed by a "make run" which involves passing a hydrocarbon oil and the oil gas formed from the hydrocarbon oil or make oil "forwardly" through the generator and "forwardly" through the superheater. During the make run, carbon is formed and deposited in the generator to a degree depending on the temperature, character of make oil, and character of the generator structure. The gas product is withdrawn from the superheater, washed, and passed to storage by procedures having nothing to do with the claimed invention.

The above steps are characteristic of many oil gas manufacturing processes of the prior art. The distinguishing characteristic of plaintiffs' process begins with the preparation of the set for the next cycle of heat and make runs.

When economic conditions made the use of cheaper oils of high Conradson carbon content desirable, a problem arose because more carbon was deposited in the generators during the make run. To solve the problem, plaintiffs' process provided an air blast directed "backwardly" through the superheater, "backwardly" through the generators, and out through the stacks. The effects of the back air blast are two-fold. First, the air, preheated by passage through the superheater, effectively burned carbon deposited in the generator during the make run; and secondly, the back blast air, after reaching its maximum temperature, was conducted through the colder part of the generator adjacent the make oil inlet, which should be the hottest part of the system before beginning the next make run. The benefits of this process were a need for less fuel oil and a more efficient distribution of heat in the system.

It was conceded that Claim 24 defined the basic process. Claim 24 defines the plaintiffs' back blast step as follows:

"introducing blast air, subsequent to said make run, into the superheating zone and passing said

blast air and blast gases backwardly through said superheating zone and backwardly through said at least one gas generating zone, removing said blast air and blast gases from said at least one gas generating zone at a point immediately adjacent the point of inlet of said hydrocarbon oil, [make oil]."

The plaintiffs' brief states:

"This step, in combination with the abovementioned conventional steps, is the real meat of plaintiffs' invention."

And plaintiffs then add:

"To further characterize plaintiffs' invention and distinguish it from prior art such as the Johnson patent, Claim 24 concludes:

"said blast air being introduced at such a rate and for such period of time as to burn substantial quantities of carbon deposited in said at least one gas generating zone and so as to transfer appreciable amounts of heat to the oil inlet end of said at least one gas generating zone and repeating the cycle."

The Examiner and the Board of Appeals denied the application, basing their adverse decisions primarily on the Johnson Patent (Defendant's Exhibit 1B). They pointed out that the Johnson process included the back blast relied upon for distinction by the plaintiffs, pointing out that the Johnson Patent in column 2, page 3, line 28, states that the efficiency of the process is greatly improved where the primary air and/or secondary air is preheated and supplies heat regenerated from the process.

At trial it was the position of the defendant that the process, as described in the Johnson patent, employing a back blast of air during the "down blast" as Johnson terms it, meets the requirements of plaintiffs' Claim 24.

There are, of course, differences and distinctions between the two processes, but the defendant contended that they were not patentable inventions and not properly set forth in the claims.

The controversy in this case is characteristic of much patent litigation. Terms, words, and cliches of double meaning are used. In this case the defendant says, "that Claim 24 reads step by step on the described Johnson process." The plaintiffs then reply:

"Thus all that the Examiner held was that *the claims failed to clearly and definitely distinguish from his erroneous conception of what the references disclosed * * *.*"

Then follows a long discussion of terms used in the claims and in the references—mere dialectics. And plaintiffs devote pages to details which distinguish their process from the Johnson process. The defendant replies that such differences are not in the claims. And after they are all considered, the defendant says, "the evidence adduced for the plaintiffs would not establish the patentability or novelty of plaintiffs' process." The argument over the extent to which the claims "read on" or can be distinguished from the references, and as to the sufficiency of the claims, is for the most part futile. The question is, Do the particulars in which the plaintiffs' process differ from the prior process, viewed in the light of accomplishments, amount to patentable invention? Or, as plaintiffs say at the end of their reply brief:

"The issue is whether or not plaintiffs' invention 'as a whole would have been obvious' to 'a person having ordinary skill in the art' (without plaintiffs' disclosure) from what is *taught by the reference*. 35 U.S.C. § 103."

The defendant's brief concludes thus:

"the evidence adduced for the plaintiffs would not establish the patentability or novelty of plaintiffs' process *even if it were assumed to include* all the limitations of temperature, condition, apparatus, and process oil which are not present in the present claims."

To this Court the evidence seemed clear that the plaintiffs' process pro-

vided a better method of conserving heat and distributing it efficiently through the system. The evidence was clear also that the plaintiffs' process had been accepted by the trade and put into general use. But the evidence failed to convince the Court that the methods by which the plaintiffs accomplished their improvements amounted to patentable invention. The evidence was not sufficient to overcome the presumption of administrative correctness, as required by Abbott v. Coe, 71 App.D.C. 195, 109 F.2d 449, and Esso Standard Oil Co. v. Sun Oil Co., 1956, 97 U.S.App.D.C. 154, 229 F.2d 37.

Judgment for defendant. Findings of fact, conclusions of law, and final order may be prepared and submitted by counsel for the defendant.